Shields, S. J.,
delivered tbe opinion of tbe Court. Deaderick, J., having been of counsel, did not sit in this cause.
Tbe bill in this cause, charges that, on July 4, 1863, the complainant and Jacob Garst made to the defendant, David Argenbright, their note for seven hundred and seventy dollars, due at one day, and payable "in the currency of the country, when called for;” and that the said note was made in consideration of "Confederate Treasury notes.” It is further charged that, on August 17, 1865, the said note was renewed by the complainant, together with one H. M. Rose, the new note being of the sum of eight hundred and sixty-six dollars and twenty-five cents, due at one day; that on September 7, 1865, the complainant conveyed to the defendant, Fain, in trust, certain real estate, in the bill described, with a power to sell, for the purpose of securing the payment of the last-mentioned note, and that the trustee, in pursuance of the said power, was about to sell the land.
It is.assumed 'in the bill that the alleged consideration for Avhich these notes were made, was of such a character as to vitiate them, and also the conveyance in ■ trust, made to secure the payment of the note last made; and the prayer of the bill is, that said note, and the said deed in trust, be declared void, and that the *130 defendants be enjoined from enforcing payment of the same by a sale, under the trust deed, or otherwise.
To this bill the defendants filed a demurrer, the ground of which seems to be, that the parties were in pari delicto, and' that the Court should not interpose. The demurrer was overruled; and, in our view of the case, it is unnecessary to consider whether the order of the Court, in this particular, was correct or not.
The defendants answered, and substantially deny that the consideration on which the note was made, was “Confederate Treasury notes;” and much proof was taken on this controverted question of fact.
Upon the hearing of the cause in the Court below, the Chancellor held that the proof sustained the allegations of the bill; and in this, we think, his conclusion was correct.
But the Chancellor further held that the legal consequence of this fact — that the note was made in consideration- of “Confederate Treasury notes” — was, that the said note, and the said deed in trust, were null and void, and that the complainant was entitled to the in-junctive relief prayed for, and he decreed accordingly.
It clearly appears from the record, that the transaction out of which this controversy arises, had no connection whatever with the civil war that at the time was flagrant; that the use of the “Confederate Treasury notes” by these parties, as a circulating medium, was not for the purpose of giving them circulation, or sustaining their credit as money or the representative of value, with a view to aiding the power that issued them, in the pending *131 struggle. The intentions and objects, of the pai’t'ies were innocent; the business’in-which they were engaged was not in contravention of law, public policy or sound morals; but finding in circulation a species of paper currency, freely passing from hand to hand, having a value in fact, and answering the demands and meeting the conveniences and the daily necessities of trade, and recognized as lawful money by their State Goverment — the circulation of which was then being enforced by said Government, and also by another and more general Government, then in existence, under the authority of which they were living — they used this paper currency, to their mutual advantage, subsistence, benefit and profit — the one party actually parting with, and the other party actually receiving, a certain available value, convertible into whatever was needed to sustain life and make it comfortable, or, if desired, into land or gold, for the purpose of a permanent and safe investment.
This is the whole case, upon the facts; and the question presented for our consideration is, was the conclusion of law drawn by the Chancellor, correct?
The question involved is not a new one in this Court. Soon after the close of the late war — so soon, that we may almost say, in the midst of arms — the cases of Wright & Cantrell v. Overall, 2 Cold., 336, and of Thornburg v. Harris, 3 Cold., 157, were decided. In these cases, and in several subsequent cases — Hale v. Sharp, 4 Cold., 275; Fain v. Headerick, 4 Cold., 327, among the number — it was held that contracts of this character were utterly null and void, because the said Treasury notes were issued by an unlawful and treason *132 able organization, to aid its treasonable purposes and designs; and because, every individal, in passing and receiving them, gave aid and comfort to the enemies of the Government. 3 Cold., 163.
In other States, where these notes were put in circulation, and answered the purposes of trade and commerce, and whore men, under the stress of the circumstances by which, “in the course of human events,” they were surrounded, and in obedience to laws tben and there being rigidly and irresistibly enforced, sold and became the owners of permanent and valuable property, in consideration of them, which they still hold and enjoy, a widely different view of the question has been taken; and those who borrowed, and in fact had received the value of them, were held to account for that value, whatever it was.
These latter decisions were also made soon after the close of the war, and have since been constantly adhered to as being sound in law and morals.
It may be true, as remarked by a very eminent Judge and jurist, in a late case in the Supreme Court of the United States, that the judgment of courts in times of. great civil commotion, are of but little authority, on a reconsideration of the question, under circumstances less calculated to disturb and sway the course of thought and reason.
Be this as it may, the tribunals of last resort in these States, have differed, and established within their respective jurisdictions, a painful conflict of judicial rulings, the more distressing, because the question is one that greatly affects the interests of the people of *133 many States, and may be considered as one of national interest and importance.
It is certainly to be desired, that the rule should be the same wherever its application is called for; that the same measure of justice should be meted to every citizen of the same general Government. Under our national organic law, this is always attainable, when the question is one that strictly arises under the Constitution and laws of the United States; and we hold, that, in a case like the one now before us, which involves a question directly affecting the citizens of so many • of our States, that, although a ruling of the Supreme Court of the United States is not absolutely binding on the State Courts, yet, that it is entitled to the very highest respect, and with rare exceptions, should be accepted and adopted by them.
Entertaining these views, we, in the midst of these conflicting judgments, in the several States in the South, turn to the tribunal of last resort under the Constitu. tion and laws of the United States, as an arbiter, the award of which we are disposed to follow, unless that award is so repugnant to authority, reason and principle, that our deliberate judgments, and dispassionate views of morality and law, forbid us to do so.
And that Court, having held, in the cases of Thorington v. Smith, and of Dean v. Younell’s Adm'r, the one from Alabama, and the other from the State of Georgia, reported in 8 Wallace, p.p. 1 and 14, the decisions having been made some years after the close of the war; that in the absence of fraud, and where there was no intention to give currency to the notes in aid of the re *134 bellion, or to otherwise aid the rebellion, and the contract was made in the usual course of business, and within the so-called Confederate States, it will be enforced, and the party required to pay the value, in fact, at the time and place, although the contract was for the payment of Confederate Treasury notes; and we, believing that the holding in these two cases is not repugnant to> but in accordance with, and well sustained by, authorty, reason and principle, adopt these judgments as being founded upon the sounder rule in law, and as being in harmony with sound morality, and, as a consequence, expressly overrule all of our cases, in which a contrary doctrine has been held.
In the case of Thorington v. Smith, approved in Dean v. Younell’s Adm'r, the validity of these contracts was affirmed on two grounds.
First, that the paper was issued and imposed on the community as currency, by irresistible force.
Second, that in using it, the parties had no actual intent to further insurrection.
Judge Chase, in delivering what appears to have been the unanimous opinion of the Court, says:
“There are several degrees of what is called de facto Government.”
Such a government, in its highest degree, assumes a character very closely resembling a lawful government. This is when the usurping government expels the regular authorities from their customary seats and functions, and establishes itself in their place, and so becomes the actual government of a country. The distinguishing characteristics of such a government is, that *135 adherents to it in war, against the government de jure, do not incur the penalties of treason,; and under certain limitations, obligations assumed by. it, in behalf of the country, or otherwise, will, in general, .be respected by. the government de jure, when restored.!’
But he denies that the Confederate States was a Government of this kind, because it succeeded, in establishing its authority only over a portion of the territory of the government de jure.
But, he continues, “there is another description of government, called, also, by publicists, a government de facto, which might, perhaps, be more aptly, denominated a government of paramount force. Its distinguishing characteristics are: First, that its existence is maintained by active military power, within the territories, and against the rightful authority of an established and lawful government; and second, .that while it exists, it must be obeyed in civil matters, by private citizens, who, by acts of obedience, rendered in submission to such force, do not become responsible, as wrong doers for those acts, though not warranted by the laws of the rightful government. Actual governments of this sort, are established over districts differing greatly in extent- and conditions. They are usually administered directly by military authority, but they may be administered also by civil authority, supported more or less directly by .military force.”
It is, then, expressly held that the Government of the Confederate States belonged to the latter class, that is, though not a government de facto, in the highest degree, it was a government of paramount force, and that *136 “obedience to its authority, in civil and local matters, was n t only a necessity, hut a duty,” and that “without such obedience, civil order was impossible.”
After stating the fact that Confederate notes, while the war lasted, had a contingent value, and were used as money in all their business transactions, by many millions of people, Judge Chase states the conclusion of the Court in the following language: “It seems to follow, as a necessary consequence, from this actual supremacy of the insurgent government as a belligerent, within the territory where it circulated, . and from the necessity of civil obedience on the part of all who remained within it, that this currency must be considered in the Courts of law, in the saíne light as if it had been issued by a foreign government temporarily occupying a part of the territory • of the United States. Contracts stipulating for payments in this currency, can not be regarded for that reason only, as made in aid of the foreign invasion in the one case, or of the domestic insurrection in the other. They have no necessary relations to the hostile government, whether invading or insurgent. They are transactions in the ordinary course of civil society, and though they may indirectly and remotely promote the ends of the unlawful government, are without blame, except when proved to have been entered into with actual intent to further invasion or insurrection. "We can not doubt that, such contracts should be enforced in the Courts of the United States, after the restoration of peace, to the. extent of their just obligation.^
To this reasoning we are compelled to give our assent. But while we thus fully concur in the con- *137 elusion, we can not fully agree with the learned Judge in his premises. In our opinion, the distinction taken between a government de fado and a government of paramount force, is merely nominal, and not founded in any substantial difference. "We can not agree that the usurping government must have expelled the lawful government from its entire territory, before it becomes a government de facto, nor that to constitute it such, it is necessary that its existence should be acknowledged by either the government de jure, or foreign gov-ments. It may be a historical fact, that all the instances of governments de facto that have existed, involved the total subversion for the time, of the government de jure throughout its entire territory. But this does not affect the reason of the law applicable to such governments in fact, which is, as we understand it, that being of irresistible force and power, and some government being better than none, the citizen is excused and justified in obeying its laws, civil and military, and can not be questioned for doing so by the government de jure, when restored to its rightful dominion and authority. The mátter is thus strongly stated by Blackstone: “ When, therefore, a usurper is in possession, the subject is excused and justified in obeying and giving him assistance, otherwise, under a usurpation, no man would be safe, if the lawful prince had a right to hang him for obedience to the powers that be, as the usurper would certainly do, for disobedience. Nay, further; as the mass of people are imperfect judges of title, of which, in all cases, possession is prima facie evidence, the law compels no man to yield obedience *138 to. that prince whose right is, by want, of possession, rendered uncertain and disputable, till providence shall think fit to interpose in his favor, and decide the ambiguous claim.” See also, Vattel, pp. 97, 98, 99.
As to the value and authority of the opinion of this great commentator, on the principles of the-common law, we deem it proper to here quote from the opinion of Judge Marshall; perhaps the greatest legal mind that this country has produced; in the celebrated- treason case of Burr, as follows: “The superior authority of adjudged cases will never be controverted. But those celebrated elementary writers, who have stated the principles of the law, whose statements have received the common approbation of legal men, are not to be disregarded. Principles laid down by such writers as Coke, Hale, Foster and Blackstone, are not lightly to be regarded. These books are in the hands of every student. Legal opinions are formed upon them, and those opinions are afterwards carried to the bar, the bench and the Legislature, and,” he adds, “are entitled to much respect.”
Now, we ask, what possible difference can it be to the citizen or subject; and the whole question relates to him and his rights; whether the usurper has possession of the whole territory of the government de jure, or only of that portion of it where he resides and inhabits? Is he not as much subject to, and as much bound to yield obedience to the “powers that be,” and does not the reason of the law apply as strongly in the one case as in the other? We> of course, do not mean to say that the reason of the law calls for its applica *139 tion to ordinary insurrections. But when a political power in fact, is set up and established, with well defined territorial limits, having a regular civil and military government, orderly, complete and efficient in all its parts — its legislative department enacting laws, which are duly promulgated; its executive department executing those laws, with unquestioned and unquestionable authority; its judges, everywhere, in the exercise of the functions of their offices, and an army in the field, capable, for the time being, to maintain the existence and absolute authority of the whole governmental fabric, to the entire exclusion of the power of the government de jure, although such government in fact may not have extended or assumed to extend its authority over the whole of the territory of the government de jure, yet, to all persons within its limits, it is, to all intents and purposes, a present, existing, omnipotent, military and political being; and all the principles applicable to the questions that spring inevitably from the existence of a government de facto, come into active operation, and become “the law of the case.” It is a maxim, that like reason doth make like law; and it has been well said, the law consists not in particular instances and precedents, but in the reason of the law; for reason is the life of the law.
But, conceding that the Confederate States did not constitute a government de facto in the highest degree, and can only be regarded as “ a government of paramount force,” these- transactions in Confederate notes had the sanction, authority and enforced circulation, of governments de facto, according to the most stringent and restricted *140 idea and definition of such a government. Before the war, the several State governments were, unquestionably, governments de jure, to which their citizens owed allegiance, and which were endowed, under the Constitution and laws of the United States, with a sovereignty that enabled them to pass laws defining and punishing acts of war and resistance against them, as high treason. These State governments had and exercised immediate authority over the persons and property of all their citizens. The power of the State government was at the door of every citizen; its “dignity” constantly before him, and he ¡dwelt continually within the shadow of its “peace.” It was the municipal law of his State, administered and enforced by the judicial and executive officers of his State, that he studied, read and comprehended, and that protected him in the enjoyment of life, liberty and private property. And when these State governments, through and by their legislative and executive officers, attempted to sever the bonds that bound them to the General Government of the United States, and to become, as States, component parts of the revolutionary Government of the Confederate States of America, they passed laws requiring their citizens to withdraw their •allegiance from the Government of the United States, and yield it to the Government of the Confederate States. They required their judges and all other officers to take oaths to support the Constitution and authority of the Confederate States, which they did; and those officers actually exercised the functions of their several offices under that Government. They passed laws requiring their citizens to render military service to *141 the Confederate States, and rigidly enforced their execution. And what is more pertinent, if possible, to the present discussion, they enacted laws recognizing Confederate Treasury notes as a lawful currency and representative of value.
Now, grant that from and after May 6, 1864, as has been declared, the State Government of Tennessee was a mere usurpation, an unlawful and treasonable organization, yet it was a fact that existed; it was a Government that enforced its laws; it was a Government that actually, in the language of Judge Chase, expelled the regular and lawful authorities from their customary seats and functions, established itself in their place, and so became the actual Government of the country. In the language of Blackstone, a usurper was in possession, and the right of the lawful authorities, by want of possession, was rendered uncertain and disputable. It was, therefore, a government de facto, “in the highest degree,” so closely “resembling the lawful government,” that “the mass of the people,” looking only to the possession, and being permitted to look only to the possession, were, by every law, human and divine, bound to yield to it their obedience in both civil and military matters, and are “execused and justified” in doing so.
But we will not pursue the discussion of this branch of the question any further. It is unnecessary to do so, as the authority which we adopt in settling this vexed question in our State, arising out of transactions in Confederate notes, holds that the paramount power under which they were issued and placed in circulation, be its proper name what it may, was sufficient to now sane *142 tion such contracts in law. But it is very clear to our minds, that if the distinction taken by Judge Chase were substantial, and if it were necessary to uphold these contracts and to do justice, that they should have had, at the time they were made, the sanction of a government de facto, “in the highest degree,” and exactly analogous to the European instances, that such a government, to say the least of it, and granting that it was a usurpation, existed in the State Government of Tennessee during the late war.
It has been frequently held, that, if the contract do not grow out of the illegal act, and is wholly unconnected with it, and is not a part of the original scheme, and founded on a new consideration, it is not tainted by the illegal act, although it may be known to the contracting parties.* Nor does it make any difference, that such new and independent contract is made with the person who is the contriver and conductor of the original illegal act, if it is wholly disconnected therefrom; Armstrong v. Toler, 11 Wheat. 261, 262; Brooks v. Martin, 2 Wal., 70. In the case of Orchard v. Hughes, 1 Wallace, 75, which was a suit brought by Hughes to foreclose a mortgage, Orchard set up, by way of defense, that a part of the consideration of the mortgage consisted of the bills of a bank that had not been legally chartered, which was a device to deceive the public, and which bills -were fraudulently put into circulation, and were of no validity or value; but on it *143 being made to appear that the bills were current, and in circulation at the time they were received, and had a value in fact, and were actually used by the bor-' rower, in the payment of his debts, it was held that the defense was not sufficient. .It is, therefore, clear, that the two cases in 8 "Wallace, are well sustained by authority on this point, and we are also well satisfied with the manifest justice and reason of the rule.
We are fully impressed with the importance of uniformity of decision, acknowledge the soundness of the doctrine of stare cleaisis, and admit the evils that attend a constant fluctuation in judicial opinion. Precedents should, as a general rule, be duly regarded and implicitly followed. But there are cases that have been so ill-considered, and that are so palpably wrong, that it becomes the duty of a succeeding Court to overrule them. Such cases have been frequently overruled, both in this country and England; Mr. Greenleaf has published an entire volume of them; and Judge Kent said that he knew more than one thousand cases that had been overruled, doubted, or limited in their application. The language of Sir William Jones, in his Essay on Bailment, is, therefore, too strong, when he. says, “ no man who is not a lawyer, would ever know how to act; and no man who is a lawyer, would, in many instances, know what to admit, unless Courts were bound by authority, as firmly as the Pagan Deities were supposed to be bound, by the decrees of fate.” .. 1 Kent, 477.
Where a decision, or a series of decisions, have established a rule of property, and more particularly,- a rule affecting title to real estate, which has become gen *144 erally known and been acted upon, such a land-mark should not be disturbed. But where there is no such restraining consideration; where the thing determined is of recent origin, not supported by former precedents, but contrary to the highest and most respectable authorities of other States, and of the United States; where the decision has not met the approbation of the profession at large, nor of the people; where it is clearly repugnant to the principles of common justice, and has had the practical effect to enable one man to take an undue advantage of another; such decision, or series of decisions, should be examined without fear, and revised without reluctance, rather than have the character of our law impaired, and the beauty and harmony of the system destroyed by the perpetuity of error. 1 Kent, 477; Haywood, Judge, in Barton v. Shall, Peck, 231, 232.
For these reasons, we feel warranted in departing from the past course of decisions in this State, on the “Confederate money question,” and in adopting the doctrine asserted with so much force of reason in the national tribunal of last resort. In doing this, we, in fact, produce uniformity of decision. We but make the rule the same in our State Courts, with the rule in the Federal Courts sitting in our State, and with the Courts in our sister States. In doing so, we do no one any harm. The question is not one of that character that disturbs a land-mark of property, or a right vested or acquired, under the former decisions; at least not any that is founded in justice or right. It is true, many demands of this character have passed into judgment against them, for which there is now no rem *145 edy; but that is no reason why other parties should be denied their right to receive the actual value of that which they parted with, to another’s profit to that extent, at the time and place.
The state of the pleadings in this cause, do not require any adjudication as to the measure of damages to be .recovered in an action founded upon a contract to pay Confederate notes, and we consequently make none.
The decree of the Chancellor will be reversed, and the bill dismissed.

 See Naff v. Crawford, ante p. 111; and see Tedder v. Odum, Nashv., 1870, Acc.